**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARGUERITTE KIBEL, | No. 16-56169 |
| Plaintiff-Appellant, | D.C. No. 2:14-cv-03861-SVW-PLA |
| v. | |
| AETNA LIFE INSURANCE COMPANY, | MEMORANDUM* |
| Defendant-Appellee. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted February 6, 2018
Pasadena, California

Before: REINHARDT, W. FLETCHER, and OWENS, Circuit Judges.

Plaintiff-Appellant Margueritte Kibel ("Kibel") appeals from the district

court's judgment for Defendant-Appellee Aetna Life Insurance Company

("Aetna") under the Employee Retirement Income Security Act of 1974. The

district court concluded that Aetna properly denied Kibel long-term disability

benefits because she had not established that she was totally disabled under the

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

terms of Aetna's long-term disability plan. We reverse and remand.

"When a district court reviews de novo a plan administrator's determination of a claimant's right to recover long term disability benefits, the claimant has the burden of proving by a preponderance of the evidence that [she] was disabled under the terms of the plan." *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162–63 (9th Cir. 2016). To be entitled to benefits, Kibel must prove that she was "totally disabled" under the terms of Aetna's plan during her time of coverage. Kibel was covered by Aetna's long-term disability plan until her employment at City National Bank ceased on February 20, 2013. Aetna's plan provides, "[Y]ou will be deemed to be totally disabled on any day if, as a result of disease or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your own occupation and you are not working in your own occupation." Kibel has sustained her burden to prove that her multiple sclerosis ("MS") prevented her from performing with reasonable continuity the substantial and material acts required by her job as a Relationship Manager at City National Bank on or before February 20, 2013.

Kibel's job required her to devote 65 percent of her time to "[o]utside [s]ales [e]fforts." This included "finding, identifying and developing new clients . . . through proactive outside calling efforts and cultivating strong partnerships with center of influences [sic] in and around the community." The other 35 percent of

2

Kibel's job involved "[p]ortfolio [m]anagement," which included "managing a portfolio of both business and personal relationships." Though the parties debate whether Kibel could do a "sedentary" or "light" job under the classifications set forth by the Department of Labor's Dictionary of Occupational Titles, our inquiry is focused on whether Kibel could do her "own occupation," as is required by the terms of Aetna's plan. *See Armani*, 840 F.3d at 1162–63.

The district court held that Kibel did not meet her burden to prove that her MS prevented her from doing her "own occupation" because the "most credible" evidence in the administrative record "[did] not suggest sufficient physical impairment." The district court reasoned that this evidence, reports from Kibel's treating physician, Dr. Peter-Brian Andersson ("Dr. Andersson"), referred to Kibel as "healthy," "doing ok," and "normal." Regardless of these labels, other evidence in the administrative record established, by a preponderance of the evidence, that Kibel could not do her job.

In mid-2011, Kibel collapsed twice: once while entertaining clients, and a second time while meeting with a supervisor. These incidents led Kibel to take time off work and visit Dr. Andersson. In January 2012, Dr. Andersson ordered MRI reports. These reports revealed that Kibel had developed 17 areas of brain damage. The radiologist who interpreted the MRI found "evidence of demyelinating disease" in Kibel's brain and cervical spine, and a suggestion of

such in her thoracic cord. Kibel returned to work in March 2012, but could no longer work as of April 4, 2012. In November 2012, Kibel still hoped that she could resume working and received a doctor's note authorizing her return. The doctor explained that he "warned her that she may not be able to [work]," but that "[s]he was very intent on giving an attempt." By December 2012, Kibel recognized that she was physically unable to resume work and had to move in with her parents. As of February 2013, when Kibel was finally terminated, the administrative record makes clear that she was still trying to return to work. In its termination letter, City National Bank explained that despite its accommodation of her request to extend the period of time in which she might find a job within the company that would meet the physical restrictions ordered by her doctor, it was unable to do so. This evidence supports the conclusion that Kibel wanted to, but could not, do her job.

In affirming Aetna's decision to deny Kibel long-term disability benefits, the district court also highlighted the fact that Dr. Andersson's reports had "one great constant"—that Kibel suffered from "mild fatigue." "[M]ild fatigue," the district court concluded, did not prevent Kibel "from performing the physical demands of a relationship manager at a bank." But the administrative record makes clear that fatigue in MS patients is different from fatigue experienced by healthy individuals. Fatigue in MS patients "is caused by demyelination in the central nervous system,"

4

and is described by many patients "as their most debilitating symptom." Stachowiak, Julie, The Multiple Sclerosis Manifesto 52 (2010). Fatigue in MS patients may also be caused not "directly by the MS disease process itself," but may result from "living will all [the other MS] symptoms and trying constantly to compensate for abilities [MS patients] used to have." *Id.* at 53. For MS patients, fatigue is "an overwhelming tiredness that is not directly related to increased activity." *Id.* at 52.

Despite this, neither Aetna nor the district court was persuaded that Kibel's fatigue would prevent her from doing her job based on their speculation that her fatigue was the product of depression, not MS. But Aetna and the district court failed to consider the evidence in the administrative record that established that depression is a symptom of MS. Such evidence makes clear that Kibel's fatigue, even if a product of depression, could ultimately have been rooted in her MS. Moreover, it establishes that the district court and Aetna clearly erred in failing to consider the personal statement that Kibel submitted explaining that her fatigue did, in fact, render her totally disabled. *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904–07 (9th Cir. 2016) (holding that the district court abused its discretion in failing to consider a claimant's subjective account of pain). Given that Kibel's personal statement described her fatigue as "an overpowering feeling of extreme tiredness, exhaustion, [and] weakness," which left her "completely

drained physically and mentally," and resulted in "a complete slowdown of [her] brain and body," this evidence, appropriately considered, further supports finding that Kibel's MS prevented her from doing her job.

With this administrative record, Kibel has established by a preponderance of the evidence that she was totally disabled under the terms of Aetna's long-term disability plan, *see Armani*, 840 F.3d at 1162–63, and that Aetna was obligated to award benefits, *see Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 681 (9th Cir. 2011). We therefore reverse and remand with instructions to the district court to direct an award of benefits to Kibel and to conduct any further proceedings consistent with this order.

**REVERSED AND REMANDED.**